ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL X

| | | |
|---|---|---|
| FREDDY REINA BUSTAMANTE<br><br>Apelante<br><br>v.<br><br>ORACLE CARIBBEAN INC.<br><br>Apelada | TA2026AP00010 | *Recurso de Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2024CV5045<br><br>Sobre:<br>Cobro de Comisiones<br>Ley Núm. 2 de 17 de octubre de 1961.<br>Ley Núm. 379 de 15 de mayo de 1948. |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Ronda Del Toro y la Jueza Lotti Rodríguez

**Ronda Del Toro, Juez Ponente**

## SENTENCIA

En San Juan, Puerto Rico, a 27 de febrero de 2026.

Comparece ante nos Freddy Reina Bustamante (en adelante el "Apelante") mediante un Recurso de Apelación instado el 1 de enero de 2025. En su recurso, nos solicita que revoquemos la Sentencia emitida por el Tribunal de Primera Instancia (en adelante "TPI o foro primario") el 23 de diciembre de 2025.

Por los fundamentos que expondremos a continuación se confirma la Sentencia emitida por el TPI.

## I.

El 4 de junio de 2024, el Apelante presentó una Querella en contra de Oracle Caribbean, Inc (en adelante, el "Apelado") al amparo de la Ley Núm. 379 del 15 de mayo de 1948 conocida

como la Ley para Establecer la Jornada de Trabajo en Puerto Rico.[1] Dicho estatuto se limita a establecer cuál es la jornada laboral de ocho (8) horas y que se pagara a tiempo doble el salario que exceda de las horas antes mencionadas. El Apelante se acogió al procedimiento sumario establecido por la Ley Núm. 2 del 17 de octubre de 1961. En la Demanda se alegó que el Apelante era Director de Ventas para Oracle y que como parte de su compensación se le daba un salario y comisiones por ventas realizadas, entre otros beneficios.[2]

El Apelante realizó una venta al Gobierno de las Bahamas a través del Ministerio de Finanzas con el propósito de proveerle servicios en la nube y almacenamiento de datos en los servidores de Oracle en Estados Unidos como en las Bahamas. Según surge de la Demanda la venta realizada y sus distintos componentes fue por la cantidad de $21,481,264.81. Además, se alegó que la "[Apelada] ha cobrado y recibido el pago de todos los equipos, servicios y administración vendidos por Reina y su equipo".[3] Por lo cual, según el Apelante le correspondía una comisión de $190,193.00 cantidad que no ha sido satisfecha.[4]

El 13 de junio de 2024, se diligenció el emplazamiento a la Parte Apelada.[5]

El 24 de junio de 2024, la Apelada presentó su Contestación a Querella.[6] En este escrito se admitieron y negaron las alegaciones según corresponde. Además, se expuso que "[s]e alega afirmativamente que la Ley. Núm. 379 de 15 de mayo de 1948, según enmendada, es inaplicable toda vez que el

---

[1] Véase Ent. Sum. TPI. Núm. 1.
[2] *Íd*.
[3] *Íd*., pág. 2.
[4] *Íd.*
[5] Véase Ent. Sum. TPI. Núm. 5.
[6] Véase Ent. Sum. TPI. Núm. 7.

querellante laboró para Oracle en todo momento como empleado exento".[7]

Luego de varios incidentes procesales, el 30 de julio de 2025, la Apelada formuló una Moción de Sentencia Sumaria. [8] En dicho escrito se reiteró que la Ley Núm. 379 del 15 de mayo de 1948 no es de aplicación al caso, debido a que al estatuto no les aplica a los empleados exentos. Además, expusieron que:

> [D]e su propia deposición y de los documentos de apoyo, incluido como exhibits de esta Moción, surge claramente que (i) Reina firmó y aceptó los términos del Plan de Compensación Oracle, el cual establece que las comisiones no se ganan hasta que el cliente pague en su totalidad, y (ii) la orden relacionada fue cancelada y el cliente nunca realizó pago alguno. Véanse Exhibits I, V y VI; Contestación a Interrogatorios Núms. 30, 42, 43 y 44. (Negrillas Omitidas).

El 8 de septiembre de 2025, el Apelante presentó su Oposición de la parte Querellante a la Moción de Sentencia Sumaria radicada por la Querellada. [9] Según surge del escrito Oracle le facturó al Gobierno de las Bahamas bajo el Contrato CPQ- 27115131 por la cantidad de $1,1945,102.36. Por lo cual, debió haber recibido la comisión correspondiente. Por último, estableció que:

> La orden CPQ-3367194, firmada por la querellada y el gobierno de Bahamas en Octubre del 2024, es según provee la sección 9B de la orden, una enmienda a la orden CPQ-2715131, que fue vendida por Reina, por lo que Reina, tiene el derecho también a cobrar comisiones por la orden CPQ-3367194, debido a que los servicios y productos que aparecen en la orden CPQ-3367194, son actualizaciones de productos y servicios vendidos por Reina al gobierno de Bahamas que al mes de octubre de 2024, la fecha en que se firmó la orden CPQ-3367194, continuaban utilizando, y además confirman que la alegación de la querellada de que cancelo y descontinuo los servicios y productos vendidos por Reina al gobierno de Bahamas de Software as a Service at Customer, (nube privada) y

---

[7] *Íd*., pág. 7.
[8] Véase Ent. Sum. TPI. Núm. 64.
[9] Véase Ent. Sum. TPI. Núm. 64.

no honró la orden CPQ-2715131, es falsa, debido a que según lo que dispone la sección 9B de la orden CPQ-3367194, la misma es una enmienda a la orden CPQ-271531, que a la fecha en que se firmó la orden CPQ-3367194, en octubre del 2024, todavía estaba vigente y Oracle continuaba prestando servicios de Software as a Service at Customer (nube privada), razón por la cual fue enmendada. Ver exhibit 1 Depo Reina pg. 194- 199 y Ver Exhibits, 4,5, 6 y 7.

El 24 de septiembre de 2025, el Apelado presentó su Réplica a "Oposición de la parte querellante a la moción de sentencia sumaria radicada por la querellada".[10] En su escrito primordialmente resaltó que el Apelante "admitió treinta y cuatro (34) de los cuarenta y ocho (48) hechos materiales presentados por la Compañía que no está en controversia".[11] Además, manifestaron en múltiples ocasiones que el Apelante no logró controvertir los hechos en la Solicitud de Sentencia Sumaria y no cumplió con la Regla 36.3 (b)(3) de Procedimiento Civil.[12] En lo que respecta a la comisiones no cobradas y la cancelación del Contrato, los Apelados expusieron que :

[E]l propio querellante reconoce que los servicios de Oracle comenzaron a utilizarse por el cliente en junio de 2024, es decir, más de un año después de su desvinculación con la Compañía, lo que evidencia que el contrato original no completó su segunda fase y fue reemplazado por nuevos servicios. Y es que, las órdenes CPQ-3130172 y CPQ-3367194, firmadas por *Bahamas Ministry of Finance* en octubre de 2024, no son una simple continuación del contrato anterior. Como surge expresamente de su cláusula 9B, estas reemplazan o enmiendan las órdenes firmadas en enero de 2023. Son, por tanto, contratos distintos y nuevos, posteriores a la relación laboral del querellante.

El 30 de septiembre de 2025, el Apelante formuló su Oposición [sic] de la parte Querellante a la réplica [sic] a la

---

[10] Véase Ent. Sum. TPI. Núm. 72.
[11] *Íd*., pág. 5.
[12] *Íd*., pág. 13.

oposición [sic] a la moción [sic] de sentencia sumaria radicada por la querellada.

El 23 de diciembre de 2025, el foro primario emitió su Sentencia en la cual declaró "Ha Lugar" la Solicitud de Sentencia Sumaria. Además, realizó las siguientes determinaciones de hechos:

1. Oracle es un proveedor de tecnología que facilita las labores que hacen los clientes haciendo uso de la tecnología. Algunos de los servicios que provee Oracle son a través de aplicaciones tales como *Enterprise Resource Planning (ERP) y Human Capital Management (HM)*. ERP facilita el manejo de contabilidad, incluyendo el proceso de compras y el proceso de pago a suplidores. Oracle HM facilita la administración del talento humano.
2. Reina Bustamente recibió una oferta de Oracle el 9 de junio de 2016, pero firmó la misma el 31 de enero de 2017.
3. Reina Bustamente comenzó a trabajar para Oracle en Puerto Rico el 15 de febrero de 2017 como *Technology Sales Manager*.
4. Antes del 15 de febrero de 2017, Reina Bustamente trabajó para Oracle en Colombia y México.
5. Como *Technology Sales Manager*, Reina Bustamante tenía derecho a un *starting compensation at an annual rate* of 140,000, un *car allowance* de $7,200, plan médico, plan dental, así como el pago de comisiones.
6. Reina Bustamante declaró que hay dos (2) conceptos básicos para recibir el pago de comisiones: (1) la cuota y (2) la aceleración. En Oracle se le denomina *cuota* al presupuesto de ventas que se debe cumplir. Si el sueldo base del empleado es de $100,000 y su participación es del 5%, la cuota fijará el objetivo de ventas. Si se supera el objetivo, la comisión se acelera. Si no se alcanza, la comisión es lineal.
7. El 28 de junio de 2018, Reina Bustamante pasó a ocupar la posición de *Application Sales Manager*, devengando un salario base anual de $157,000, más un car allowance de $7,200 al año.
8. Como *Application Sales Manager*, Reina Bustamente declaró que recibía compensación variable o comisiones y plan médico.
9. Reina Bustamente declaró que, durante su empleo en Oracle, se encargó de la venta de aplicaciones en la nube, como Oracle Fusion Cloud ERP, que permite a las empresas gestionar sus recursos y operaciones a través de la nube.

10. Además, como Application Sales Manager, Reina Bustamente declaró que sus funciones principales eran supervisar un grupo de empleados que, generalmente consistía en cuatro (4) o cinco (5) personas. Con este equipo, trabajaba en la división del territorio y la clasificación y asignación de cuentas. Su labor incluía gestionar la cuota predefinida para cada territorio. Asimismo, era responsable de entrenar al equipo de ventas en los *sales plates* y los objetivos de ventas de Oracle y de acompañar a los vendedores en visitas o clientes o en situaciones que requerían una escalada, como reuniones con gerentes o directores de organizaciones. Reina Bustamente declaró que esta responsabilidad abarcaba todo el Caribe, enfocándose en clientes del sector privado.

11. Reina Bustamente declaró que su compensación variable o comisiones, dependía de la cuota asignada y el porciento o *rate* que tenía asignada la posición particular. En su rol como *Application Sales Manager*, su cuota rondaba los 2 millones de dólares en aplicaciones y su *rate* de comisión era aproximadamente 7%.

12. En marzo de 2020, Reina Bustamente pasó a ocupar la posición de *Technology Sales Representative*.

13. Reina Bustamente admitió que dicho cambio en posición se le ofreció Alfonso López y, terminó aceptando libre y voluntariamente, a pesar de que el salario que iba a devengar era menor al que tenía como *Application Sales Manager*.

14. Reina Bustamante, como Technology Sales Represenative, reconoció que lo que recibía por concepto de comisiones cambió. Específicamente, declaró que su rate de comisión para el cálculo de estas fue de 12%. Aunque no tiene documentos que lo confirmen, Reina Bustamente declaró que durante el periodo que ocupó esa posición, el cual fue menos de un (1) año fiscal, ese *rate* se mantuvo constante y no experimentó cambios.

15. Como *Technology Sales Representative*, las tareas y responsabilidades de Reina Bustamente incluían trabajar con el Territorio asignado, clasificar las cuentas, identificar y colaborar con aliados de negocios para penetrar esas cuentas y finalmente, esforzarse por cerras las ventas.

16. Reina Bustamente reconoció que, desde mayo del 2021 hasta octubre del 2022, pasó a ocupar la posición de Sales Manager de Oracle, también enfocado en el territorio del Caribe.

17. Como director de Ventas de Aplicaciones, Reina Bustamante era responsable de supervisar al equipo de ventas, asegurar recursos de consultoría de

preventa, gestionar demostraciones y responder a RFPs, RFIs así como crear ofertas. También, se encargaba de trabajar con los *partners* existentes para asegurar su capacitación y de reclutar nuevos *partners* para su certificación con Oracle. Sus funciones incluían participar en negociaciones, definir territorios, calificar cuentas junto a los vendedores y apoyarlos en procesos de ventas complejas.

18. Como director de Ventas de Aplicaciones, Reina Bustamante se reportaba a Alfonso López.

19. Reina Bustamante reconoció que siempre tuvo una relación cordial de trabajo con Alfonso López y nunca tuvo problema alguno con él.

20. Alfonso López es *Managing Director, Caribbean and Central America de Oracle*.

21. Alfonso López fue quien le comunicó a Reina en abril de 2023, que Oracle iba a prescindir de sus servicios. No obstante, desconoce quien o quienes tomaron la decisión de prescindir de sus servicios.

22. Desde septiembre del 2023, hasta febrero de 2025, Reina trabaja por su cuenta brindado servicios de consultoría en ventas. Además, es partner de Oracle y vende productos, como software de Oracle a distintos clientes.

23. Reina Bustamante admitió que, durante su empleo en Oracle, a principio del año fiscal de cada año recibía una Política de Plan de Compensación de Ventas del año recibía una *Política de Plan de Compensación.*

24. Reina Bustamante reconoció que, en junio del 2022, recibió el *Plan de Compensación de ventas* del Año fiscal 2023 de Oracle, vigente desde el 1 de julio de 2022 hasta el 31 de mayo de 2023.

25. Reina Bustamante recibió, además, el Acuerdo de Compensación Individualizada para el Año Fiscal de 2023 de Oracle. Reina Bustamante reconoció que recibió y firmó dicho Acuerdo en junio del 202 [sic] y luego en diciembre de 2022.

26. Reina Bustamante declaró que recibió adiestramientos u orientación de los términos y condiciones del Plan de Compensación y estaba familiarizado con el mismo.

27. El método mediante el cual se calculan las comisiones, según dispuesto en el Plan de Compensación de Ventas del Año fiscal 2023 Términos y Condiciones vigente desde el 1 de julio de 2022 hasta el 31 de mayo de 2023, es el siguiente:

- Determinación del Crédito por Ventas para tarea Transacciones dentro del territorio de un Empleado y elegibilidad de productos/ servicios.
- Aplicación del Factor de Compensación al Crédito por Ventas, cuyo resultado es el Crédito de Compensación.

Este último se multiplica por las tasas de comisión pertinentes para obtener el importe del pago de la comisión.

28. El *Acuerdo de Compensación Individualizada* para el Año fiscal 2023 dispone lo siguiente:

Al hacer clic en "Aceptar", declara que recibió y aceptó su Plan de Compensación de Ventas de Oracle para el año fiscal 2023 (el Plan) y acepta los términos y condiciones. El Plan consta de este Acuerdo de Compensación Individualizado (ICA, Individualized Compensation Agreement) y de los términos y condiciones del año fiscal 2023 (solo empleado de Ventas en Estados Unidos) Comprende que las comisiones y bonificaciones no se ganan hasta que el cliente haya pagado la totalidad y la compañía toma una decisión definitiva y haga los ajustes, modificaciones o cambios descritos en los términos y condiciones del año fiscal 2023. Reconoce que los pagos realizados antes de las adiciones, ajustes, modificaciones o cambios definitivos se consideran como anticipo. Se prohíbe introducir modificaciones no autorizadas en el Plan y no se reconocerán ni aplicarán. Los términos y condiciones del año fiscal 2023 establecen la autoridad para introducir modificaciones en el Plan.

29. Reina Bustamante reconoció que para que realizaran pagos bajo el Plan era necesario que el cliente de Oracle hubiese pagado la totalidad adeudada.

30. La Orden Núm. CPQ-2715131-1 fue otorgada el 17 de enero de 2023.

31. La Orden Núm. CPQ-2794231-1 fue otorgada el 17 de enero de 2023.

32. La Orden Núm. CPI-2798320-1 fue otorgada el 17 de enero de 2023.

33. La Orden Núm. CPQ- 2798743-1 fue otorgada el 17 de enero de 2023.

34. Las Órdenes Núm. CPQ-2715131-1, CPQ-2794231-1, CPI-2798320-`y CPQ-2798743-1 aparecen firmadas por Simon Wilson, en representación de Bahamas Ministry of Finance y por Alfonso López, en representación de Oracle Caribbean, Inc.

35. La Orden Núm. CPQ-3367194 fue otorgada el 15 de octubre de 2024.

36. En la sección B titulada Amendment and Replacement de la Orden Núm. CPQ-3367194 se dispuso lo siguiente:

**B. Amendment and Replacement**

You agree that this order (the "New Order") amends and replaces the following order(s) between the parties, CPQ-2715131 and CQP-2794231 dated 17-

JAN-2023, including all expansion orders to those orders and all amendments thereto (Collectively, the "previous Services Order"), under which You [sic] previously acquired Oracle Fusion (the "previous Services"), and that, accordingly, You hereby amend and replace the Previous Services identified in the Previous Services Order. NOW, THEREFORE, in consideration of the foregoing and the mutual agreements and the covenants set forth on the New Order and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree to amend and replace the Previous Services Order. You and Oracle agree that the execution of this New Order is simultaneous with the termination of the Previous Services Order, as well as the Previous Services.

37. La Orden Núm. CPQ-31300172-1 fue otorgada el 15 de octubre de 2024.

38. En la sección B titulada Amendment and Replacement de la Orden Núm. CPQ-31300172-1 se dispuso lo siguiente:

**B. Amendment and Replacement**

You agree that this order (the "New Order") amends and replaces the following order(s) between the parties, CPQ-2752770-1 dated 17-JAN-2023, including all expansion order to those orders and all amendments thereto (collectively, the "Previous Services Order"), under which You previously acquired Oracle Paas and Iass Universal Credits ("the Previous Services"), and that accordingly of the foregoing and the mutual agreements and covenants set forth on the New Order and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree to amend and replace the Previous Services Order. You and Oracle agree that the execution of this New Order is simultaneous with the termination of the Previous Service Order, as well as the Previous Services.

39. Las Órdenes Núm. CPQ-3367194-1 y CPQ-31300172-1 aparecen firmadas por Simon Wilson, en representación de Bahamas Ministry of Finance por Alfonso López, en representación de Oracle Caribbean, Inc.

40. Reina Bustamante admitió que las comisiones por concepto de venta de servicios en la nube (primera fase) le fueron pagadas.

41. Reina Bustamante declaró que su reclamación se circunscribe a las comisiones relacionadas al producto de Software as a Service.

42. Reina Bustamante no tiene conocimiento de si algún empleado de Oracle recibió comisiones por concepto de la segunda fase.

43. Reina Bustamante fue despedido de su empleo en Oracle en abril de 2023.

Inconforme con esta determinación, el 1 de enero de 2026, el Apelante presentó su Recurso de Apelación en este foro apelativo en el cual realizó ocho (8) señalamientos de errores:

### PRIMER SEÑALAMIENTO DE ERROR

Erró el TPI en su conclusión de que la orden, CPQ3367194, reemplazo las ordenes CPQ2715131 y CPQ 2794321, debido a que los servicios y productos vendidos por Reina en las ordenes CPQ 2715131 y CPQ 2794231, fueron descontinuados y quedaron obsoletos, cuando contrario a la conclusión, del TPI, surge de la propia orden CPQ 3367194, que la misma es una orden de actualizaciones, "updates", de los productos y servicios vendidos por Reina a través de las ordenes CPQ 2715131 y CPQ2794231, que aun, al día de hoy, continúan siendo utilizados por el gobierno de Bahamas, para manejar sus compras y recursos humanos.

### SEGUNDO SEÑALAMIENTO DE ERROR

Erró el TPI en su conclusión de hecho de que aunque Oracle facturo al gobierno de Bahamas, bajo la orden CPQ 2715131 vendida por Reina, y el gobierno de Bahamas pago la cantidad de $1,945,193.00, por concepto de los productos y servicios vendidos por Reina bajo la misma, Reina no tenía derecho a recibir ninguna comisión por dicho pago, no empecé a que el TPI reconoció en sus conclusiones de hecho, que Reina tenía derecho a recibir el pago de comisiones por los servicios y productos vendidos por este, a razón del 8% de sus ventas, y surge claramente que el pago del gobierno de Bahamas por la cantidad de $1,945,193.00  fue por concepto de productos y servicios facturados por Oracle bajo la orden CPQ2715131, vendida por Reina, por lo que dice Reina tenía derecho a recibir el 8% de comisión por concepto de dicho pago.

### TERCER SEÑALAMIENTO DE ERROR

Erró el TPI en su conclusión de que como Oracle enmendó la orden CPQ2715131, antes de su vencimiento, con la Orden CPQ 3367194, Reina no tiene derecho al pago de comisión sobre el pago realizado por el gobierno de Bahamas de $1,945,102,36, por concepto de los servicios y productos facturados por Oracle bajo la Orden CPQ 2715131, antes de que dicha orden fuese enmendada o cancelada por la Orden CPQ 3367194, no empecé a la conclusión de hechos del TPI de que Reina tenía derecho al 8% de comisión por concepto de sus ventas y el pago de las mismas, que incluían el pago por la cantidad de $1,945,102.36 emitido por el gobierno de Bahamas, para pagar los productos y servicios facturados por Oracle bajo la orden CPQ2715131.

### CUARTO SEÑALAMIENTO DE ERROR

Erró el TPI en su conclusión de que los servicios y productos vendido por Reina en la Orden CPQ 2715131, que fueron de Software as a Service to Customer, Enterprise Resource Planning, y el del Human Capital Management, y por los cuales Reina solicita el pago de su comisión sobre el pago de $1,945,102.36, realizado por el gobierno de Bahamas por los mismos, fueron descontinuados y cancelados por la Orden CPQ 3367194, no empecé a Reina, en los párrafos 35,36,40 y 47 de la Oposición, estableció que los productos y servicios vendidos por Reina en la Orden CPQ 2715131, continúan siendo utilizados por el governó de Bahamas, inclusive al día de hoy, por lo que los mismos, nunca fueron descontinuados así como tampoco cancelados.

### QUINTO SEÑALAMIENTO DE ERROR

Erró el TPI en su conclusión de que Reina no tenía derecho el pago de sus comisiones bajo la orden CPQ 3715131, y por el pago realizado por el gobierno de Bahamas por la cantidad de $1,945,102.36, facturado bajo la orden CPQ2715131, lo cual ocurrió, aun si se toman como correctas las conclusiones de hecho del propio TPI, que establecieron que la orden CPQ 3367194, reemplazo y cancelo la orden CPQ 2715131, por lo que lo que [sic] el pago realizado por el gobierno de Bahamas por la cantidad de $1,954,102.36, facturado bajo la orden CPQ 2715131, la cual según las conclusiones del propio TPI, fue cancelada y los servicios y productos vendidos por Reina fueron descontinuados y cancelados, luego de que el gobierno de Bahamas emitiera dicho pago, por lo que Reina tenía derecho al pago de 8% de comisión sobre el mismo, debido a que fue el pago final emitido por el gobierno de Bahamas por la orden CPQ 2715131.

### SEXTO SEÑALAMIENTO DE ERROR

Erró el TPI en su conclusión de que para Reina tener derecho al pago de comisiones por la venta de la Orden CPQ 2715131, el gobierno de Bahamas tenía que pagar la totalidad de la orden CPQ 2715131, ascendente a 22 millones de dólares, debido a que la misma es contraria al contenido de la orden de compra CPQ 2715131, Exhibit 4 de la Oposición, que establecía que los pagos del gobierno de Bahamas por los servicios y productos vendidos en la orden CPQ 2715131 y a los cuales Reina tenía derecho al pago de comisiones, serian realizados cada 4 meses vencidos, y que la cantidad de pago, dependía de los servicios utilizados por el gobierno de Bahamas, lo que confirma que para Reina tener derecho al pago de comisiones, no se requería que la orden CPQ 2715131, fuese pagada en su totalidad, debido a que la orden establecía que los pagos serian realizados cada 4 meses vencidos, más aún, cuando el TPI en su conclusión de hechos número 40, determino que Reina había recibido pagos parciales de comisiones

por concepto de la Orden CPQ 2715131, antes de que la misma fuese pagada en su totalidad.

### SÉPTIMO SEÑALAMIENTO DE ERROR

Erró el TPI en su conclusión de que la Orden CPQ 3367194, era una orden nueva, con productos y servicios nuevos, que no fueron vendidos por Reina originalmente en la orden CPQ 2715131, y que dicha orden reemplazo la orden CPQ 2715131 vendida por Reina, no empecé a que el TPI, en ningún momento realizo ningún tipo de conclusión de hecho relacionada a los productos y servicios vendidos por Oracle en la orden CPQ 2715131, por lo que la conclusión del TPI, no tiene apoyo en nada, y peor aún, es contraria a lo establecido por Reina en su oposición y al contenido de las ordenes CPQ 2715131 y a la 3367194 que establecen que la orden CPQ 3367194, es una venta de updates a de los productos vendidos por Reina en la orden CPQ 2715131,por lo que Reina tenía derecho al cobro de comisiones sobre los productos y servicios vendidos en la misma, debido a que eran solo updates de los productos y servicios vendidos por reina originalmente a través de la orden CPQ 2715131.

### OCTAVO SEÑALAMIENTO DE ERROR

Erró el TPI en su conclusión de que la orden CPQ3367194, es una orden nueva, con productos y servicios nuevos, diferentes a los vendidos por reina en la orden CPQ 2715131, que tuvo el efecto de cancelar y dejar sin efecto los productos y servicios vendidos por Reina en la orden CPQ 2715131, antes del vencimiento de la orden CPQ 2715131, no empecé a que la sección 2.1 del contrato de Servicios en la nube otorgado entre Oracle y el gobierno de Bahamas, establece que las ordenes no se pueden cancelar, y que la propia orden CPQ 3316794, en la sección 9B establece que la misma es una enmienda a la orden CPQ 2715131, y cuando surge de la propia orden CPQ 331694, que lo que se vendió en la misma son updates a los productos y servicios vendidos por Reina, y cuando reina estableció que los productos y servicios vendidos por el en la orden CPQ 2715131, aún continúan siendo utilizados por el gobierno de Bahamas la día de hoy.  (Negrillas omitidas)

## II.

## A. Sentencia Sumaria

Según el tratadista Hernández Colón una moción de sentencia sumaria "es aquella que solicita que se dicte sentencia a favor del promovente a base de prueba que a la moción se acompaña sin necesidad de que se celebre vista en su fondo porque en realidad no existe controversia real sobre ningún hecho

material en el caso". R. Hernández Colon, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6.ª ed. rev. San Juan, Ed. Lexis Nexis, 2017, pág. 313. La moción de sentencia sumaria solo va a proceder en aquellos casos en los cuales no existan *controversias reales y sustanciales* en cuanto a los *hechos materiales*, por lo que al juez solo le restará aplicar el derecho. Meléndez *González et al v. M. Cuebas*, 193 DPR 100, 109 (2015). (Énfasis suplido). El Tribunal Supremo de Puerto Rico ha establecido que "un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". *Íd*., pág. 110.

La Regla 36 de Procedimiento Civil regula el mecanismo procesal de la moción de sentencia sumaria. La Regla 36.3 inciso (e) de dicha regla dispone que para emitir una determinación de forma sumaria será necesario que las alegaciones, deposiciones, contestaciones e interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real y sustancial en cuanto a algún hecho esencial y como cuestión de derecho se dictará una sentencia favorable de la parte peticionaria. 32 LPRA Ap. V.

Por otro lado, la Regla 36.3 (b)(2) establece que la parte que conteste la moción de sentencia sumaria debe hacer referencia a los párrafos de los hechos esenciales y pertinentes que estén en controversia. 32 LPRA Ap. V. Asimismo, debe indicar las páginas de las declaraciones juradas u otra prueba en donde se establezcan los hechos que los respaldan. *Íd*. La controversia en cuanto a los hechos esenciales debe ser una real, por lo tanto, cualquier duda que surja no es suficiente para vencer la moción de sentencia sumaria. *Oriental Bank v. Perapi*, 192 DPR 7, 26 (2014).

Cuando se presente una moción de sentencia sumaria la parte promovida no puede descansar solamente en las declaraciones o negaciones de su alegación, si no que tiene el deber de contestar especifica y detalladamente como el promovente. De no actuar así, el tribunal dictara sentencia sumaria en su contra si procede. 32 LPRA Ap. V., R. 36.3 (c). *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 433 (2013). Por lo tanto, la parte que se opone a la moción de sentencia sumaria no puede cruzarse de brazos y descansar en sus planteamientos. *Oriental Bank v. Perapi*, *supra*., pág. 27.   Si no que una vez se presente una controversia real y sustancial y este se oponga a la moción de sentencia sumaria tiene que presentar prueba al juez que lo convenza de resolver a su favor. *Íd.*

El Tribunal de Apelaciones se encuentra en la misma posición que el foro primario a la hora de revistar una solicitud de sentencia sumaria. *Vera v. Dr. Bravo*, 161 DPR 308, 334-335 (2004).   El Tribunal Supremo en el caso normativo de *Meléndez González et al v. M Cuebas, supra,* pág.*, 119* estableció cual es el estándar que utilizara el Tribunal de Apelaciones si concede o niega una moción de sentencia sumaria. El estándar es el siguiente:

> Primero: (. . .) [E]l foro apelativo intermedio estará limitado en cuanto a que no puede tomar en consideración evidencia que las partes no presentaron ante el Tribunal de Primera Instancia y tampoco adjudicar los hechos materiales en controversia, ya que ello le compete al foro primario luego de celebrado un juicio en su fondo. La revisión del Tribunal de Apelaciones es de *novo* y debe examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de sentencia Sumaria al foro primario, llevando a cabo todas las inferencias permisibles a su favor.

> Segundo, por estar en la misma posición que el foro primario, el Tribunal de Apelaciones debe revisar que tanto la Moción de Sentencia Sumaria como su

Oposición cumpla con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil.

Tercero, en el caso de revisión de una sentencia dictada sumariamente, el Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia. De haberlos, el foro apelativo intermedio tiene que cumplir con las exigencias de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuales hechos materiales encontró que están en controversia y cuales están incontrovertidos. Esta determinación se puede hacer en la sentencia que disponga del caso y puede hacer referencia al listado numerado de hechos incontrovertidos que emitió el foro primario en su Sentencia.

Cuarto, y, por último, de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar de *novo* si el Tribunal de Primera Instancia aplico correctamente el Derecho a la controversia. *Íd*.

## III.

El 4 de junio de 2024, el Apelante presentó una Querella en contra de Oracle Caribbean, Inc. Según el Apelante, su causa de acción surge de la Ley Núm. 379 del 15 de mayo de 1948 conocida como la Ley para Establecer la Jornada de Trabajo en Puerto Rico. Dicho estatuto se limita a establecer cuál es la jornada laboral de ocho (8) horas y que se pagara a tiempo doble el salario que exceda de las horas antes mencionadas. Del estatuto no surge que se pueda reclamar comisión adeudada alguna como muy bien expone el Apelado.

El 30 de julio de 2025, el Apelado presentó su Moción de Sentencia Sumaria. A su vez, el 8 de septiembre de 2025, el Apelante formuló su Oposición a la Moción de Sentencia Sumaria. Del escrito se desprende que se admitieron treinta y cuatro (34) de los cuarenta y ocho (48) hechos establecidos.

El Apelante en su Recurso de Apelación nos señaló ocho (8) señalamientos de error que están vinculados a hechos en la Moción de Sentencia Sumaria. Según el caso normativo *Meléndez*

*González et al v. M Cuebas, supra* este foro apelativo se encuentra en la misma posición que el foro primario a la hora de evaluar el mecanismo sumario. Por lo tanto, es menester ver si se cumplieron con los requisitos que establece la Regla 36 de Procedimiento Civil.

Según la Regla 36.3 (b)(2) de las Reglas de Procedimiento Civil y su jurisprudencia interpretativa, la parte que se oponga a una Moción de Sentencia Sumaria tiene que detallar las páginas o secciones de la prueba en donde se establezcan los hechos que los respaldan. Además, la parte que se opone al mecanismo de sentencia sumaria no puede cruzarse de brazos y descansar en sus planteamientos.

El Apelante en su escrito de Oposición a la Moción de Sentencia Sumaria no logró con éxito controvertir los hechos materiales establecidos por los Apelados. Además, como parte opositora no abordó la medula de la moción de sentencia sumaria ni logró controvertir los hechos esenciales; en varias ocasiones se limitó a citar extractos de su deposición que no resultan pertinentes para refutar los hechos incontrovertidos.

En algunos hechos se limita a hacer meras alegaciones como en el párrafo número veinticinco (25) en donde niega el párrafo correspondiente y no ilustra a este foro sobre cuál es la evidencia que respalda el hecho de que el Gobierno de Bahamas sigue utilizando los servicios de Oracle los cuales el vendió y fue parte. Asimismo, existen otros párrafos como el treinta y cinco (35), en las cuales se limitan a identificar el número de exhibit, pero no identifica cual es el número de la página de dicho

documento que es el que respalda su postura.[13] También se da el escenario dentro de este párrafo de establecer hechos en controversia y mencionar que un exhibit lo respalda, pero sin mencionar cual.

Luego de seguir los criterios establecidos en *Meléndez González et al v. M Cuebas, supra,* pág*., 119* en el cual se evaluaron los escritos pertinentes y el expediente de *novo.* Al ver que la Oposición de la Moción de Sentencia Sumaria no cumple con los requisitos codificados en la Regla 36 de Procedimiento Civil éstos no serán considerados. A nuestro juicio, no existen hechos materiales en controversia. El Apelante tampoco pudo controvertirlos según dispone nuestras reglas procesales. El TPI aplicó correctamente el derecho a la controversia y lo que correspondía era declarar "Ha Lugar" la Solicitud de Sentencia Sumaria.

**IV.**

Por los fundamentos antes expuestos, se confirma la Sentencia del Tribunal de Primera Instancia.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[13] El hecho (39) en diferentes párrafos pasa lo mismo en el que se identifican exhibit, pero, no el número de página. Asimismo, el párrafo (40), (41), (42), (43), (44), (45), (46), (47) y (48) sufren de lo mismo.